## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL CELESTINE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. |
| | ) |
| BRYAN BISSELL, CODY O'DELL, DANIEL | ) *Jury Trial Demanded* |
| GRIJALVA, MICHAEL FERGUSON, NEW | ) |
| ORLEANS POLICE DEPARTMENT, CITY OF | ) |
| NEW ORLEANS, ABC INSURANCE | ) |
| COMPANIES 1-10 and JOHN/JANE DOES 1-10 | |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

### I.    INTRODUCTION

1.      Around 2:30 P.M. on January 13, 2020, Plaintiff Michael Celestine was standing outside his friend's aunt's house at the intersection of Pauger and North Villere Streets, a predominately black neighborhood, where he had stayed the night before. Unbeknownst to Michael, Officer Daniel Grijalva who was monitoring people on the Real Time Crime Camera at that intersection saw the outline of a hard object in Michael's jacket pocket, and believed it to be a gun. Officer Grijalva watched Michael go back inside the house.

2.      Around 4:00 P.M., Officer Grijalva saw Michael leave the house again wearing completely different clothes. Officer Grijalva believed Michael was still concealing a gun in his jacket pocket, and radioed Michael's description and path of travel to nearby officers.

3.      Officers Bryan Bissell and Cody O'Dell saw Michael on the 1500 Block of Touro Street and pulled up on him in their marked police car to conduct an investigatory stop.

4.      When the officers tried to stop him, Michael started running. Officer Bissell chased Michael into a backyard, and saw Michael trying to climb a fence.

5.      Officer Bissell pointed his handgun at Michael and shouted "I will fucking shoot you."

6.     When Michael continued to climb the fence, Officer Bissell shot him with Taser, which struck Michael twice in his buttocks and his thigh. Michael fell to the ground in pain.

7.     Officer O'Dell searched Michael three times. The first time, Officer O'Dell found nothing. The second time, on the way back to the police car, Officer O'Dell found a small package of alleged narcotics in Michael's pants pockets. Once they reached the police car, Officer O'Dell searched Michael again, and found a handgun in his pants leg.

8.     Throughout the arrest, Michael pled with Officer Bissell and Officer O'Dell several times that he could not breath. Michael was unable to hold himself up without help. He also collapsed twice.

9.     Officer O'Dell left Michael with Officer Derrick Llewellyn after putting him in the backseat of the police car. Though he saw that Michael was having difficulty breathing and holding himself up, rather than requesting EMS, Officer O'Dell instructed Officer Llewellyn not to let Michael take his jacket off and to make him "sweat it out."

10.    Michael initially gave a false name of Brandon Roberts, and provided the date of birth of August 27, 1992. Later during the arrest, Officer O'Dell obtained Michael's correct name and date of birth using a mobile fingerprint unit, and learned that Michael had a prior felony conviction for Felon in Possession of a Firearm.

11.    EMS took Michael to Tulane Lakeside Medical Center, where the emergency physician monitored him for his abnormally fast heart rate and labored breathing. The physician discharged Michael around 7:50 P.M. after having him on fluids for about three hours.

12.    After the arrest, Officer Bissell authored a Use of Force Report, and in it, alleged that he deployed his taser while Michael was on the fence because he believed Michael was armed and saw Michael reaching into his pants. However, his body-worn camera clearly shows that Michael had both hands on the fence and never reached into his pants.

13.    After he was discharged from the hospital, Michael was booked at the Orleans jail, where he has remained incarcerated since.

14.     Michael's back still hurts from falling after Officer Bissell tased him. Michael has been separated from his family for nearly a year, as of the filing of this Complaint. As a result of his arrest, Michael has spent the pandemic incarcerated at a facility that at times had a COVID-19 infection rate as high as 10%.

15.     By detaining and initially arresting Michael without reasonable suspicion or probable cause, Officers Bissell and O'Dell have wreaked havoc on his life, and forced him to spend an entire year behind bars. He also had to suffer the indignity of being tased, and then belittled by officers when asking for medical attention. When he fell, Officer O'Dell told him to stand up "like a man." When he begged that he could not breathe, the officers expressed only frustration and told him "you can breathe." When he was groaning in agony and could not get his heart rate down, Officer O'Dell insisted that he stay uncomfortable and "sweat it out." All of this shows the Officers' lack of regard for the people in their police custody, and points to a failure by NOPD and the City of New Orleans to train their officers to uphold people's constitutional rights.

16.     Officer Bissell, O'Dell and Grijalva collectively chose to stop Michael for no justifiable reason, purely as an act of racial profiling. This instance is part of a larger practice among some NOPD officers of falsely claiming to see gun-shaped bulges in clothing or witnessing nervous behavior as a means to justify an otherwise unjustifiable detention.

17.     Defendants' actions violate the United States Constitution and Louisiana law. Plaintiff seeks declaratory relief and monetary damages against all individuals who have violated his rights.

## II.     JURISDICTION

18.     Plaintiff's claims arise under the laws of the United States and Louisiana. This Court has jurisdiction over Plaintiff's claims of federal rights violations. This Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims in accordance with 28 U.S.C. § 1367.

19.     The venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in New Orleans, Louisiana

situated in the Eastern District of Louisiana.

## III.    THE PARTIES

*Plaintiff*

20.    Plaintiff **Michael Celestine** is of suitable age and capacity to file this suit. At all relevant time during this suit, he was a resident of Orleans Parish in the Eastern District of Louisiana.

*Defendants*

21.    Defendant **Bryan Bissell** is a resident of Orleans Parish. He has been a New Orleans Police Officer in Orleans Parish since 2007. He is sued in his individual capacity.

22.    Defendant **Cody O'Dell** is a resident of Orleans Parish. He has been a New Orleans Police Officer in Orleans Parish since 2017. He is sued in his individual capacity.

23.    Defendant **Daniel Grijalva** is a resident of Orleans Parish. He has been a New Orleans Police Officer in Orleans Parish since 2016. He is sued in his individual capacity.

24.    Defendant **City of New Orleans** is a municipality in the Parish of Orleans, State of Louisiana, who can be served through **Latoya Cantrell**, Mayor at New Orleans City Hall, 1300 Perdido Street, New Orleans, Louisiana. The **City of New Orleans** is a political subdivision of the State of Louisiana, for which Defendants O'Dell, Bissell, and Grijalva serve as police officers. City of New Orleans, and the New Orleans Police Department are responsible for training and supervising Officers O'Dell and Bissell. City of New Orleans has established or delegated Defendants O'Dell, Bissell and Grijalva the responsibility for establishing and implementing policies, practices, procedures, and customs used by law enforcement officers employed by City of New Orleans regarding arrests and the use of force.

25.    The Defendant, **New Orleans Police Department**, is a political subdivision of the City of New Orleans located in the Parish of Orleans, who can be served through Superintendent Shawn Ferguson at New Orleans City Hall, 715 South Broad Street, New Orleans, Louisiana.

26.    The Defendant **Shawn Ferguson**, is a citizen and resident of Orleans Parish, Louisiana,

and was at all times material to the allegations in this Complaint, employed as the Chief of Police by the New Orleans Police Department in Orleans Parish, Louisiana, and is responsible for the supervision and training of Defendants O'Dell, Bissell, and Grijalva. Defendant Ferguson, as the Chief of the New Orleans Police Department is further responsible for making and/or implementing policies and practices used by law enforcement officers employed by the City of New Orleans, Louisiana, regarding arrests and the use of force. Defendant Ferguson is sued in his official capacity.

27.     Defendant **ABC Insurance Companies 1-10** are as yet unknown insurance agencies doing business in the state who provide or provided insurance to Defendants against the kind of claims contained herein.

28.     Defendants **John/Jane Does 1-10** were employed by the United States at all relevant times as supervisors and/or in management positions at the New Orleans Police Department and/or as police officers who worked in the New Orleans Police Department. At all relevant times, Does 1-10 acted under color of federal law. They are sued in their individual capacities.

## IV.   FACTS

**A.     On January 13, 2020, near the 1500 Block of Touro Street, Officers Bryan Bissell and Cody O'Dell attempted to illegally detain Michael Celestine without reasonable suspicion or probable cause, based on information given by Officer Daniel Grijalva, who was conducting surveillance.**

29.     Michael Celestine spent the evening of January 12, 2020 at his friend's aunt's house at 2036 Pauger Street, at the intersection of Pauger and North Villere Streets.

30.     In the early afternoon of January 13, 2020, Michael stood outside the Pauger Street house to make a phone call and to chat with some acquaintances in the neighborhood. Because it was a cold winter day, Michael was wearing a white puffy Tommy Hilfiger jacket and had both hands in his pockets.

31.     Michael went for a short walk with a friend to another house around the block, where his friend knocked on the door. When no one answered, Michael went back inside 2036 Pauger.

32.     Unbeknownst to Michael, Officer Daniel Grijalva was watching him on the Real Time Crime Camera installed at the intersection of Pauger and North Villere Streets. Office Grijalva later claimed that he believed Michael was concealing a handgun because he had his hand in his right jacket pocket where Officer Grijalva saw the outline of a hard object.

33.     Officer Grijalva apparently notified nearby patrol officers Cody O'Dell and Bryan Bissell that Michael was potentially concealing a handgun. However, no officers came to the intersection or attempted to investigate further at that point.

34.     An hour and a half later, Michael came back out of the house, now wearing a thick "Rugrats"-printed jacket over a red hooded sweatshirt. Officer Grijalva told Officers O'Dell and Bissell that he still believed Michael was concealing gun in his jacket pocket, and gave Michael's direction of travel.

35.     In reality, the Real Time Crime Camera footage shows Michael frequently putting both hands in his pockets because it was a cold winter day. Contrary to Officer Grijalva's claims, no bulge or outline is visible through Michael's jacket pocket. The surveillance viewed by Officer Grijalva, which was the basis for Michael's apprehension, does not show Michael engaging in any suspicious or criminal behavior.



**Fig. 2:** *Left panel*: What Officer Grijalva saw when first watching Michael (in the white jacket).
*Right panel:* What Officer Grijalva saw when Michael left the house shortly before being arrested

36.     Officer's O'Dell and Bissell drove to the 1500 block of Touro Street in a fully marked

NOPD police van to try to detain Michael. Officer Llewellyn also came to the same location in a separate police van. Officers O'Dell and Bissell got out of their police car to try to detain Michael, but Michael started running away.

**B.    Defendant Bissell chased Michael down and used excessive force against Michael by pointing a gun at him, and tasing him, and then lied about his observations afterwards to justify his use of force.**

37.    Officer Bissell chased after Michael. Officer Bissell would later tell the Public Integrity Bureau during an investigation into his use of force that Michael pulled the gun out of his pocket while running. However, this is not corroborated in Officer Bissell's body-worn camera footage and never happened.

38.    When recounting the chase to other officers immediately on scene, Officer Bissell did not say that Michael pulled out a gun while running.

39.    Officer Bissell caught up to Michael while he was trying to climb a fence in the back of a property at 2117 North Villere Street.

40.    Officer Bissell drew his gun and shouted at Michael "I will fucking shoot you." Although drawing a handgun is considered a use of force by NOPD, Officer Bissell left this fact out of his police report.

41.    Officer Bissell would later claim in his police report that while Michael was hanging on the fence, he saw Michael reach into his pants towards what he believed was the concealed firearm. However, Officer Bissell's body-camera footage showed Michael clinging onto the fence with both hands. Michael did not reach into his pants towards a firearm. In reality, as Officer Bissell told Officer O'Dell on scene, he actually believed that Michael had discarded the gun earlier while running.

42.    When Michael again tried to climb over the fence, Officer Bissell tased him. The Taser struck Michael in his buttock and his right leg. Michael fell several feet to the ground and collapsed.

43.    Officer O'Dell arrived and helped Officer Bissell handcuff Michael behind his back while Michael was still lying face-down on the ground. They put the handcuffs on Michael incorrectly,

so that one of his wrists was twisted. Michael's wrists remained in this painful twisted position until Officer Llewellyn fixed his handcuffs over 20 minutes later.

**C.     Defendants Bissell and O'Dell ignored Michael's serious medical emergency and his repeated pleas of "I can't breathe" as punishment for Michael's running away.**

44.     Officer Bissell started to read Michael his Miranda rights. Midway through, Michael gasped several times, "I can't breathe." Officer Bissell told him to "shut up."

45.     While Michael was on the ground, Officer O'Dell searched Michael's pants pockets and down the front of his waistband. Officer O'Dell did not find anything at this point.

46.     Officer O'Dell pulled Michael up off the ground, even though Michael pleaded with him "Please let me catch my breath." In response, Officer O'Dell told him to stand up "like a man. You run like a man, you act like a man."

47.     Officer O'Dell walked Michael back to the police car while Officer Bissell retraced his steps to look for the gun he believed Michael discarded while running. As shown in Officer O'Dell's body-worn camera footage, Michael was unable to hold himself up and was doubled over for the entire walk back the police van. He groaned and gasped several times in apparent pain.

48.     After a few moments of walking, Michael collapsed on the ground. Rather than expressing concern about a potential medical emergency, Officer O'Dell exclaimed in frustration, "come on, bruh." Officer O'Dell decided to take the opportunity to search Michael again while he was on the ground, as Officer Derrick Llewellyn approached to assist. This time, Officer O'Dell found two small, wrapped bags of white powder in Michael's front pants pocket, and some bills and change. He told Michael that the Taser did not even hit him.

49.     Officers O'Dell and Llewellyn pulled Michael up and walked him several feet, telling him repeatedly to "stand up," even though Michael could not hold himself up. Michael fell a second time while groaning in pain. Officer O'Dell expressed irritation, saying "come on, man, all that drama queen shit."

50.     Officer O'Dell pulled Michael up again and walked him the rest of the way back to the car. Once they reached the police van, Officer O'Dell searched Michael a third time, and felt a handgun in Michael's pants leg. Officer O'Dell retrieved the gun, and placed Michael in the backseat of the police van.

51.     Once Michael was in the police van, Officer O'Dell told the other officers not to let Michael take any of his jackets off, and to let him "sweat it out," apparently as punishment. Without inquiring further into Michael's condition, Officer O'Dell left Michael and drove the police van to find Officer Bissell.

52.     Despite Michael's obvious physical agony, his repeated pleas of "I can't breathe," and his inability to stand up on his own, neither Officer Bissell nor Officer O'Dell called for an ambulance. In contrast to Officer O'Dell's and Officer Bissell's callous disregard of Michael's wellbeing, Officer Llewellyn stayed with Michael after Officer O'Dell left. Officer Llewellyn eventually called for EMS after Michael continued to groan in pain, and could not hold his body up even while seated inside the police van.

53.     While Michael and Officer Llewellyn were waiting for EMS to arrive, Michael called out for Officer Llewellyn's help with his handcuffs because his right wrist was twisted. When Officer Llewellyn opened the car door to help Michael, Michael was lying sideways on the seat, with his head on the car door. In this position, the only way Michael could hold himself up was using his hands, and Michael's weight was falling on his twisted wrist, causing him a great deal of pain. Officer Llewellyn fixed Michael's handcuffs.

54.     Several minutes after Officer Llewellyn called for EMS, the ambulance arrived. Paramedics took Michael to Tulane Lakeside Medical Center, and Officer Llewellyn accompanied.

**D.     Because of Defendants' violations, Michael suffered the indignity of a painful and humiliating arrest, had to be hospitalized for three hours, has been jailed for nearly a year during a dangerous pandemic, is in jeopardy of losing further liberty, and experiences ongoing back pain.**

55.     The Emergency Room physician diagnosed Michael with dyspnea—labored breathing—and tachycardia—an abnormally fast heart rate. Initially, Officer Llewellyn told the physicians that the Taser did not penetrate Michael's jeans. However, according to the Public Integrity Bureau report, the prongs penetrated his skin.

56.     The emergency room doctors kept Michael on fluids and under observation for about three hours. Michael was discharged from Tulane Lakeside Medical Center at 7:51 P.M.

57.     After he was discharged, Michael was immediately taken to the Orleans jail for booking. He was charged with resisting an officer, possession of a firearm by a convicted felon, illegal carrying of weapon with a controlled dangerous substance, illegal possession of a stolen firearm, and possession with intent to distribute cocaine less than 28 grams. His total bond was set at $21,500, and a parole hold was also placed on him, barring him from being able to bond out.

58.     As of January 12, 2021, Michael has been incarcerated for nearly a year because of Officer Bissell, Officer O'Dell, and Officer Grijalva's wrongful decision to stop and arrest Michael. Because of their actions, Michael has lost valuable time with his family. He faces the threat of additional loss of liberty over these criminal charges. He has forced to endure incarceration during the deadly COVID-19 pandemic, during which the jail has at times had as high an infection rate as 10%.[1]

59.     Michael had to endure the humiliation of being tased, and then mocked by Officer O'Dell when he begged for medical attention. He experienced physical pain from his Taser injuries, his fall, as a result of Officer Bissell tasering him. On top of this, he experienced even more pain from Officer O'Dell and Officer Bissell improperly handcuffing him. Officer Bissell's unjustified use of force caused Michael's tachycardia and dyspnea, which were medical emergencies requiring several hours of hospitalization.

60.     The New Orleans Police Department has been under a federal consent decree since 2013

---

[1] See Chart of Orleans Parish Sheriff's Office COVID-19 Inmate Cases,
https://www.opso.us/index.php?option=com_content&view=category&layout=blog&id=144&Itemid=873&limitstart=22,

because of longstanding history of "use of excessive force; unconstitutional stops, searches, and arrests, and; discriminatory and biased policing based on gender, race, national origin and sexual orientation."[2] As recently as last year, NOPD came under fire when officers were caught lying on their body-cameras and conspiring to fabricate a reason for an unconstitutional stop.[3] On June 25, 2020, the Consent Decree Monitor issued a special report finding serious shortcomings with supervision in NOPD Task Forces.[4] NOPD officers continue to violate people's constitutional rights through unjustified stops, racial profiling, and excessive force. The failure of upper brass to prioritize training and supervision means that this toxic culture within NOPD prevails despite the years-long federal consent decree.

61.      NOPD command has long been aware that its officers are committing rampant constitutional violations, and in refusing to address these problems through supervision and training, is implicitly condoning these violations. In 2019, then-Commander of NOPD 8th District Nicholas Gernon sent a letter to then-Deputy Chief Paul Noel detailing concerns about two of his officers receiving similar citizen complaints within a short period of time, although neither officer was found at fault.[5] Gernon wrote: "Although in both of these instances the Officers were not found to have been in violation of any departmental regulations, the similar nature of the investigations as well as the close nature of the complaints merits a closer look at these officers' behavior as well as corrective action to ensure this is not a pattern of larger concern."[6] Gernon requested that NOPD review the training the officers received, as well as the department's own handling of those and similar complaints. Rather than reviewing NOPD practices and training, NOPD command reassigned Gernon to head the Crime Lab,

---

[2] See Court Finalizes Consent Decree to Transform the New Orleans Police Department, Department of Justice (Jan. 11, 2013), https://www.justice.gov/opa/pr/court-finalizes-consent-decree-transform-new-orleans-police-department.
[3] See "Arrests by French Quarter undercover unit scrutinized after 'disconnect between body-cam video, testimony,'" John Simerman and Matt Sledge, The Advocate and Times-Picayune (May 16, 2020), https://www.nola.com/news/courts/article_48cba680-97be-11ea-bf0a-d7edda47a1b1.html.
[4] See Special Report of the Office of the Consent Decree Monitor Reporting The Results Of The Monitoring Team's Audit Of The NOPD District-Based Task Forces, (June 25, 2020), http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/593-001%20MONITOR'S%20SPECIAL%20REPORT%20DISTRICT-BASED%20TASK%20FORCES.pdf.
[5] See Nicholas Gernon Letter (2/1/2019), attached as Ex.1.
[6] Ex. 1 (Gernon Letter), at 1.

where he would no longer supervise field officers, removing a key watchdog within the department.[7]

62.     The same culture that silenced Commander Gernon and ignored the need for more training and supervision of officers still flourished at NOPD when Michael's rights were violated on January 13, 2020. Paul Noel, who ignored Gernon's letter, was still Deputy Chief of NOPD on January 13, 2020, and remained in that position until he was demoted when his officers were caught lying on body-camera last year in the incident discussed above.[8]

63.     The reason why Gernon's letter was ignored, why the Consent Decree Monitor found widespread supervision deficiencies, and why a high-profile incident of officers violating the Fourth Amendment and fabricating reasonable suspicion cost the NOPD second-in-command his position are all, at base, the same. NOPD has a culture among its officers of racial profiling, using excessive force, and violating people's Fourth and Fifth Amendment rights, and this culture has become the policy, practice and custom of NOPD as a whole because the Department protects, rather than train or supervise, officers who commit these violations.

64.     The Defendants' treatment of Michael is just one glaring product of NOPD's failure to train and supervise its officers. Their attitudes, acts, and omissions are all indicative of a larger culture within the department of violating people's constitutional rights without fear that they will be held accountable.

65.     At all times relevant to this Complaint, the above Defendants were acting under color of state law.

## V.     CLAIMS FOR RELIEF

**Count One – Excessive Force in Violation of the Fourth Amendment and 42 U.S.C. § 1983
(Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official
capacity, Defendants Bissell, O'Dell and Grijalva in their individual capacities, ABC Insurance**

---

[7] See "Switch in New Orleans police leadership for French Quarter, CBD looms as part of wider shakeup, sources say," Ramon Antonio Vargas, The Advocate and Times-Picayune (Mar. 27, 2019), https://www.nola.com/news/crime_police/article_3e65411f-7dae-519c-8278-4bf276405ad3.html.
[8] See "Sources: NOPD to shake up leadership amid allegations of improper searches, arrests," Ramon Antonio Vargas, The Advocate and Times-Picayune (May 21, 2020), https://www.nola.com/news/crime_police/article_0026c5b2-9b89-11ea-9803-3bf960e3bfeb.html.

**Companies 1-10 and Jon/Jane Does 1-10)**

66.     Officer Bissell employed excessive and unreasonable force, and caused excessive and unreasonable force to be employed, against Michael Celestine, as specifically alleged above, in violation of Plaintiff's rights under the Fourth Amendment.

67.     Officer Bissell acted under the color of law as evidenced by the fact that he was acting in the course of his employment a police officer with the New Orleans Police Department.

68.     Officer Bissell used excessive and unreasonable force when he pointed his department issued firearm at Michael and threatened "I will fucking shoot you" without justification, when Officer Bissell did not have probable cause or even reasonable suspicion to believe that Michael had committed, or was about to commit, any felony.

69.     Officer Bissell used excessive and unreasonable force when he tased Michael, causing Michael to fall several feet to the ground, even though he did not believe at the time that Michael was a threat to him or others.

70.     As a result of Officer Bissell's excessive force, Michael suffered taser wounds penetrating his skin on his buttock and thigh. Officer Bissell's excessive force was also the direct cause of Michael's fall, which has caused him lasting pain to his back.

71.     As a result of Officer Bissell's excessive force, Michael also suffered tachycardia and dyspnea for several hours, requiring three hours of hospitalization.

72.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights. Defendants' misconduct was the cause of Plaintiff's injuries.

73.     Defendants' unconstitutional acts directly and proximately caused compensable injury to Plaintiff Michael Celestine.

74.     Defendants engaged in these wrongful acts and omissions in the scope of their employment with the New Orleans Police Department.

75.     Defendants engaged in these wrongful acts and omissions as part of the policies, practices and customs of the New Orleans Police Department.

76.     The City of New Orleans is liable for these uses of force because local governments can be liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) when "the action of the policymaker itself violated a constitutional right." *See Anderson v. Larpenter*, 16-13733 (E.D. La. July 18, 2017), *citing Burge v. Parish of St. Tammany,* 187 F.3d 452, 471 (5th Cir. 1999); *see also Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986), *Hampton Co. Nat. Sur., LLC v. Tunica County, Miss*., 543 F.3d 221, 227 (5th Cir. 2008). Here, Officer Bissell is a final policymaker for the City of New Orleans and New Orleans Police Department. The city is also liable under the doctrine of *respondeat superior* (*see* Louisiana Civil Code article 2320) and Louisiana indemnity law requiring public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

**Count Two – Unlawful Seizure in Violation of the Fourth Amendment and 42 U.S.C. § 1983 (Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official capacity, Defendants Bissell, O'Dell and Grijalva in their individual capacities, ABC Insurance Companies 1-10 and Jon/Jane Does 1-10)**

77.     Officer Bissel and Officer O'Dell committed an illegal seizure when they attempted to detain Michael Celestine. Although Michael ran, the seizure occurred at the moment the officers jumped out of their car in order to detain him and demonstrated their intent to detain him.

78.     This was an illegal seizure because they had no reasonable suspicion that Michael had committed any crime.

79.     Officer Grijalva caused an illegal seizure when he caused Officer O'Dell and Officer Bissell to seize Michael on the false basis that he observed a hard firearm-like object in Michael's jacket pocket.

80.     Defendants' unconstitutional acts directly and proximately caused compensable injury to

Plaintiff Michael Celestine.

81.     Defendants engaged in these wrongful acts and omissions in the scope of their

employment with the New Orleans Police Department.

82.     Defendants engaged in these wrongful acts and omissions as part of the policies, practices

and customs of the New Orleans Police Department.

83.     The City of New Orleans is liable for this claim under *Monell*, *respondeat superior*, and

indemnity as described above.

**Count Three – False Arrest in Violation of the Fourth Amendment and 42 U.S.C. § 1983
(Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official
capacity, Defendants Bissell, O'Dell and Grijalva in their individual capacities, ABC Insurance
Companies 1-10 and Jon/Jane Does 1-10)**

84.     Officer Bissell and Officer O'Dell effected a false arrest when they arrested Michael

without probable cause that Michael had committed any crime.

85.     This was a false arrest because at the time of arresting Michael, they had not recovered

any firearm or contraband. Michael had not committed resisting an officer because the officers' initial

attempt to detain him was unlawful. The officers did not have adequate reason to believe Michael had

committed any crime.

86.     Defendants' unconstitutional acts directly and proximately caused compensable injury to

Plaintiff Michael Celestine.

87.     Defendants engaged in these wrongful acts and omissions in the scope of their

employment with the New Orleans Police Department.

88.     Defendants engaged in these wrongful acts and omissions as part of the policies, practices

and customs of the New Orleans Police Department.

89.     The City of New Orleans is liable for this claim under *Monell*, *respondeat superior*, and

indemnity as described above.

**Count Four – Manufacturing of False Evidence in Violation of the 14th Amendment and 42 U.S.C.
§ 1983
(Against New Orleans Police Department, and City of New Orleans; Defendant Ferguson in his
official capacity, Defendant Bissell in his individual capacity, ABC Insurance Companies 1-10 and
Jon/Jane Does 1-10)**

90.     Where a person has been deprived of liberty as a result of false evidence manufactured by

law enforcement officers, there is a deprivation of liberty that violates due process of law. *See Mooney v.*

*Holohan*, 294 US 103 (1935).

91.     "Evidence" refers not only to physical evidence, but also testimony and statements.

92.     Here, Officer Bissell's police report stating that he observed Michael "running with a

pistol in his right hand" was a lie. Officer Bissell's body-worn camera does not show Michael holding a

gun during the chase.

93.     Officer Bissell also falsely claimed in his police report that he tased Michael based on

Michael being "armed and actively resisting." This is false because Officer Bissell did not believe

Michael was armed when he tased Michael.

94.     Defendant Bissell's unconstitutional acts directly and proximately caused compensable

injury to Plaintiff Michael Celestine.

95.     Defendant Bissell engaged in these wrongful acts and omissions in the scope of their

employment with the New Orleans Police Department.

96.     Defendant Bissell engaged in these wrongful acts and omissions as part of the policies,

practices and customs of the New Orleans Police Department.

97.     The City of New Orleans is liable for this claim under *Monell*, *respondeat superior,* and

indemnity as described above.

**Count Five – Deliberate Indifference to Serious Medical Needs in Violation of Fourteenth
Amendment and 42 U.S.C. 1983
(Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official
capacity, Defendants Bissell and O'Dell in their individual capacities, ABC Insurance Companies
1-10 and Jon/Jane Does 1-10)**

98.     Officer Bissell and Officer O'Dell were deliberately indifferent to the serious medical needs of Michael.

99.     Officer Bissell and Officer O'Dell should have been aware that clearly established law required them to attend to Michael's serious medical needs when he began to suffer a medical emergency that directly resulted from Officer Bissell's use of excessive force.

100.    Officer Bissell's and Officer O'Dell's failure to attend to Michael's serious medical needs amounted to deliberate indifference to his wellbeing while he was in their custody.

101.    Defendants' unconstitutional acts directly and proximately caused compensable injury to Plaintiff Michael Celestine.

102.    Defendants engaged in these wrongful acts and omissions in the scope of their employment with the New Orleans Police Department.

103.    Defendants engaged in these wrongful acts and omissions as part of the policies, practices and customs of the New Orleans Police Department.

104.    The City of New Orleans is liable for this claim under *Monell*, *respondeat superior,* and indemnity as described above.

**Count Six - Violation of the Louisiana Constitution, Article I, Section IV**
**(Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official capacity, Defendants Bissell, O'Dell and Grijalva in their individual capacities, ABC Insurance Companies 1-10 and Jon/Jane Does 1-10)**

105.    Officers Bissell's and O'Dell's actions in conducting and causing the seizing, detaining, and use of force on Plaintiff as described above interfered with his exercise of fundamental rights as guaranteed by Louisiana's Constitution.

106.    Officer Grijalva, in instructing Officer Bissell and Officer O'Dell to detain Michael without reasonable suspicion, also caused the seizing, detaining, and use of force on Michael, which interfered with his exercise of fundamental rights as guaranteed by Louisiana's Constitution.

107.    Defendants' unconstitutional acts directly and proximately caused compensable injury to

Plaintiff Michael Celestine.

108.    Defendants engaged in these wrongful acts and omissions in the scope of their

employment with the New Orleans Police Department.

109.    Defendants engaged in these wrongful acts and omissions as part of the policies, practices

and customs of the New Orleans Police Department.

110.    The City of New Orleans is liable for this claim under *Monell*, *respondeat superior,* and

indemnity as described above.

## Count Seven – Assault and Battery
**(Against Defendant Ferguson in his official capacity, Defendant Bissell in his individual capacity, New Orleans Police Department, City of New Orleans, ABC Insurance Companies 1-10 and Jon/Jane Does 1-10)**

111.    Officer Bissell's use of force against Michael constituted assault and battery.

112.    It was an assault because it put him in immediate apprehension of a non-consensual

harmful touching.

113.    It was a battery because Officer Bissell completed a non-consensual harmful touching by

tasering Michael.

114.    Defendant Bissell's unconstitutional acts directly and proximately caused compensable

injury to Plaintiff Michael Celestine.

115.    Defendant Bissell engaged in these wrongful acts and omissions in the scope of his

employment with the New Orleans Police Department.

116.    Defendant Bissell engaged in these wrongful acts and omissions as part of the policies,

practices and customs of the New Orleans Police Department.

117.    The City of New Orleans and Defendant Ferguson are liable for this claim under *Monell*,

*respondeat superior,* and indemnity as described above.

## Count Eight – State Law Malicious Prosecution
**(Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official capacity, Defendants Bissell, O'Dell and Grijalva in their individual capacities, ABC Insurance Companies 1-10 and Jon/Jane Does 1-10)**

118.    The Louisiana Supreme Court has articulated a six-part test for stating a claim of malicious prosecution: "(1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff." *Lemoine v. Wolfe*, 168 So.3d 362, 367 (La. 2015).

119.    Here, Officer Bissell and Officer O'Dell caused the commencement of a criminal proceeding against Michael Celestine they arrested Michael for illegal carrying of a weapon, illegal carrying of a weapon while in possession of a controlled dangerous substance, possession of a firearm by a convicted felony, resisting an officer, and possession with the intent to distribute cocaine.

120.    Michael's charges are still pending because of court delays stemming from the COVID-19 pandemic.

121.    There is no probable cause for such the charges of possession with intent to distribute cocaine and resisting an officer because Michael did not resist a *lawful* detention, and he did not have the intent to distribute drugs.

122.    Officers O'Dell and Bissell acted with malice because these unjustified additional charges are merely one way they punished Michael for running (for example, Officer O'Dell telling another officer not to let Michael take his jacket off and to "sweat it out" even though Michael could not even catch his breath).

123.    Defendants' unconstitutional acts directly and proximately caused compensable injury to Plaintiff Michael Celestine.

124.    Defendants engaged in these wrongful acts and omissions in the scope of their employment with the New Orleans Police Department.

125.    Defendants engaged in these wrongful acts and omissions as part of the policies, practices

and customs of the New Orleans Police Department.

126.    The City of New Orleans is liable for this claim under *Monell*, *respondeat superior,* and indemnity as described above.

**Count Nine – Failure to Supervise, Train, or Discipline under 42. U.S.C. § 1983**
**(Against City of New Orleans, New Orleans Police Department, Defendant Ferguson in his official capacity, ABC Insurance Companies 1-10 and Jon/Jane Does 1-10 )**

127.    Defendant Ferguson failed to adequately train, supervise and/or discipline officers under his supervision, including all other individual Defendants, as to the unlawful conduct described in Counts 1-8.

128.    Defendant Ferguson and other members of NOPD command were aware of the problems with officers committing constitutional violations, and of the need for greater training and supervision.

129.    Defendant Ferguson and other members of NOPD command ignored calls within the department for more training and supervision, and protected, rather than discipline, officers who committed constitutional violations.

130.    Defendant Ferguson acted and failed to act with gross negligence, recklessness and deliberate indifference to Plaintiff's clearly established constitutional rights.

131.    Defendant Ferguson's conduct directly and proximately caused the deprivations of Plaintiff's clearly established constitutional rights, and also directly and proximately caused the Defendants and others to deprive Plaintiff of those rights.

**VI.    RELIEF REQUESTED**

1.    The Plaintiff requests a trial by jury.

2.    Wherefore Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

a.   Declaratory relief;

b.   Injunctive relief;

c.   Judgment against Defendants for Plaintiff's asserted causes of action;

d.   Award of compensatory damages;

e.   Award of special damages;

f.   Award of punitive damages;

g.   Award costs and attorney's fees;

h.   Interest;

i.   Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

MICHAEL CELESTINE, by and through counsel,

/s/ Graham Bosworth
GRAHAM BOSWORTH
La. Bar No. 29538
700 Camp Street
New Orleans, LA 70130
T: (504) 507-0831
Email: bosworth@bosworthlegal.com