## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL CELESTINE, )<br><br>Plaintiff, )<br><br>v. )<br><br>BRYAN BISSELL, CODY O'DELL, DANIEL )<br>GRIJALVA, and DOE INSURANCE )<br>COMPANIES 1-10 )<br>Defendants. ) | Case No. 2:21-cv-00067-JTM-DPC<br><br>*Jury Trial Demanded* |

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff Michael Celestine, through undersigned counsel, brings this complaint against Defendants Bryan Bissell, Cody O'Dell, Daniel Grijalva and Doe Insurance Companies 1-10, all of whom are jointly and severally liable for the intentional, excessive, and otherwise tortious conduct set forth below.  Plaintiff alleges as follows:

### INTRODUCTION

1.   On January 13, 2020, New Orleans Police Department ("NOPD") Officers Bryan Bissell, Cody O'Dell and Daniel Grijalva ("Defendants") violated Michael Celestine's clearly established rights under the U.S. Constitution and Louisiana law.  They unlawfully stopped him, arrested him, stunned him with a Taser, searched him, and ignored his obvious need for medical assistance—presuming him guilty of an unidentifiable crime for simply walking down the street with his hands in his jacket pocket on a cold day. Predictably, the criminal charges did not stick.

2.   Mr. Celestine's experience reflects a long trend that shows Black men are subjected to excessive force and baseless stops and searches at rates disproportionately greater than their representation in the population.[1]

---

[1] Phillip Goff, et al., *The Science of Justice: Race, Arrests, and Police Use of Force*, CENTER FOR POLICING EQUITY, 1, 15 (July 2016), *available at* https://policingequity.org/images/pdfs-doc/CPE_SoJ_Race-Arrests-UoF_2016-07-08-1130.pdf (finding that the rate of use of force on Black people was 2.6 times as high as the rate for White people); Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, NATURE HUMAN BEHAVIOR, 736 (July 2020), *available at* https://www.nature.com/articles/s41562-020-0858-1.

3.   Defendants Bissell, O'Dell and Grijalva violated Mr. Celestine's clearly established rights despite the fact that, for nearly eight years, NOPD had been under a Consent Decree with the U.S. Department of Justice, which had found that NOPD was engaged in a pattern and practice of discriminatory policing, using excessive force, and stopping, searching and arresting people without adequate legal justification.[2]   Entered, monitored and enforced as an order of this Court, the Consent Decree expressly proscribes what Defendants Bissell, O'Dell and Grijalva did to Mr. Celestine. Consistent with the Fourth Amendment, the Consent Decree prohibits investigative stops without reasonable articulable suspicion, arrests without probable cause, and force that is unreasonable—including the deployment of a Taser on a non-violent suspect who does not pose an imminent threat of physical harm.   The Consent Decree has spawned NOPD policies that flesh out these very same prohibitions.   It also has required Department-wide training on these prohibitions—training that Defendants Bissell, O'Dell and Grijalva received.

4.   Defendants Bissell and O'Dell unlawfully stopped Mr. Celestine based on a directive from Defendant Grijalva, who purportedly observed Mr. Celestine on a "Crime Cam" with his hands in his winter jacket pocket over a "bulge."   There was no bulge, and there was nothing suspicious about someone with his hands in his jacket pocket on a winter day.

5.   Defendants Bissell and O'Dell arrested Mr. Celestine for resisting an officer because he ran from them when they approached him.   But because they had neither lawfully detained him nor notified him that they were detaining him when he ran, Defendants Bissell and O'Dell lacked probable cause for the arrest.

---

[2] United States Department of Justice Civil Rights Division, *Investigation of the New Orleans Police Department*, March 16, 2011, *available at* https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf.

6.    Defendant Bissell used excessive and objectively unreasonable force against Mr. Celestine by first threatening him with a gun and then tasing him.  The Taser strike caused Mr. Celestine to fall onto his back from a height of several feet as he tried to climb a fence.  Mr. Celestine was not behaving violently and posed no threat of physical harm to Defendant Bissell or anyone else when he ran and mounted the fence.

7.    After being struck by Defendant Bissell's Taser and falling off the fence onto his back, Mr. Celestine repeatedly gasped "I can't breathe," complained of pain, and had difficulty walking without falling or limping.  Defendants O'Dell and Bissell ignored Mr. Celestine's obvious distress.  Defendant O'Dell even sought to exacerbate Mr. Celestine's discomfort, telling other officers not to allow Mr. Celestine to remove his jackets so he could "sweat it out."  In contrast, a fellow officer called an ambulance.  The ambulance took Mr. Celestine to a hospital, where an emergency room doctor diagnosed him with shortness of breath (dyspnea) and a rapid heartbeat (tachycardia).  Mr. Celestine was kept in the emergency room for nearly three hours until he stabilized and could be discharged.

8.    Between them, Defendants Bissell and O'Dell searched Mr. Celestine four separate times following his arrest for resisting an officer.  Eventually, they found two small bags of suspected cocaine in his pant pocket and a gun down his pant leg.  These invasive full-body searches were unlawful because the arrest itself was unconstitutional.

9.    Mr. Celestine spent more than a year in jail, during coronavirus outbreaks, before the Orleans Parish District Attorney dropped all charges against him.

## JURISDICTION

10. Mr. Celestine's claims arise under the laws of the United States and Louisiana.  This Court has jurisdiction over Mr. Celestine's claims for violations of the United States Constitution under 28 U.S.C. § 1343 and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Mr. Celestine's state law claims under 28 U.S.C. § 1367.

11. Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in New Orleans, Louisiana, which is in the Eastern District of Louisiana.

## THE PARTIES

12. Plaintiff **Michael Celestine** is of suitable age and capacity to file this suit.  At all relevant times during this suit, he was a resident of Orleans Parish in the Eastern District of Louisiana.

13. Defendant **Bryan Bissell** is a resident of Orleans Parish.  He has been an NOPD officer in Orleans Parish since 2007.  He is sued in his individual capacity.  At all relevant times, he was acting under color of the law of the State of Louisiana.

14. Defendant **Cody O'Dell** is a resident of Orleans Parish.  He has been an NOPD officer in Orleans Parish since 2017.  He is sued in his individual capacity.  At all relevant times, he was acting under color of the law of the State of Louisiana.

15. Defendant **Daniel Grijalva** is a resident of Orleans Parish.  He has been an NOPD officer in Orleans Parish since 2016.  He is sued in his individual capacity.  At all relevant times, he was acting under color of the law of the State of Louisiana.

16. Defendant **Doe Insurance Companies 1-10** are yet unknown insurance agencies that are doing business in the state of Louisiana and that provide or provided insurance that cover the kind of claims contained herein.

17. All Defendants are jointly and severally liable for the tortious conduct set forth below.

## FACTS

### A.  The Unlawful Investigative Stop

18. Mr. Celestine spent the evening of January 12, 2020 at his friend's aunt's house on Pauger Street, at the intersection of Pauger and North Villere Streets in New Orleans.

19. At approximately 2:00 p.m. on January 13, 2020, Mr. Celestine stood outside the Pauger Street house to make a phone call.  When he was outside, he spoke with a friend in the neighborhood.

20. Because it was a cold winter day, Mr. Celestine was wearing multi-colored sweatpants and a white puffy Tommy Hilfiger jacket; at all times, he either had one hand in his jacket pocket and another holding his phone as he used it, or both hands in his jacket pockets.

21. Mr. Celestine went for a short walk with his friend to another house down the street, where his friend knocked on the door. When no one answered, Mr. Celestine returned to the Pauger Street house and went inside alone. In total, Mr. Celestine was outside for about 15 minutes.

22. Unbeknown to Mr. Celestine, Defendant Daniel Grijalva was watching him on the Real Time Crime Camera ("Crime Cam") installed at the intersection of Pauger and North Villere Streets.

23. On information and belief, Defendant Grijalva notified other officers that Mr. Celestine was potentially concealing a handgun. However, no officers came to the intersection or attempted to investigate.

24. Crime Cam footage does not suggest, much less show, that Mr. Celestine was concealing a handgun.

25. At approximately 4:00 p.m., nearly two hours after going back into the Pauger Street house, Mr. Celestine came back outside. He was now wearing dark jeans and a thick "Rugrats"-printed jacket over a red hooded sweatshirt.

26. On information and belief, Defendants O'Dell and Bissell heard Defendant Grijalva, who was still watching the Crime Cam, report that he still believed Mr. Celestine was concealing a gun in his jacket pocket. Defendant Grijalva provided Mr. Celestine's location and indicated the direction in which Mr. Celestine was travelling.

27. The Crime Cam footage shows Mr. Celestine frequently putting both hands in his pockets. No bulge or outline of a hard object, much less the outline of a gun, is visible through his jacket pocket. Nor does the surveillance, which formed the basis for Mr. Celestine's apprehension, show Mr. Celestine engaging in any criminal or otherwise suspicious behavior.



*Left panel*: A still image of what Defendant Grijalva saw when first watching Mr. Celestine (in the white jacket).

*Right panel:* A still image of what Defendant Grijalva saw when Mr. Celestine left the Pauger Street house shortly before being arrested.

28. Shortly after 4:00 p.m., Defendants O'Dell and Bissell drove to the 1500 block of Touro Street in a fully marked NOPD police van with the express intent of committing an investigative stop. Defendants O'Dell and Bissell got out of the van with the intention of detaining Mr. Celestine.  When they did, Mr. Celestine started running.  Neither Defendant O'Dell nor Bissell spoke to Mr. Celestine before Mr. Celestine began running.

### B.  The Unlawful Arrest and Unlawful Tasing

29. Defendant Bissell pursued Mr. Celestine on foot.  Defendant Bissell would later tell the Public Integrity Bureau during an investigation into his use of force that Mr. Celestine pulled a gun out of his pocket while running.  This never happened.  Defendant Bissell's body worn camera footage shows that Mr. Celestine took no such action.

30. As Defendant Bissell continued his pursuit, Mr. Celestine jumped a low fence in a backyard. At this point, Defendant Bissell drew his gun and shouted "I will fucking shoot you."

31. Mr. Celestine attempted to climb a second fence in the back of a property at 2117 North Villere Street.  Defendant Bissell approached with his gun still drawn.

32. Defendant Bissell's police report states that he was "under the impression that the subject was armed[.]"  But based on his subsequent statements to colleagues and his subsequent actions, Defendant Bissell clearly believed that Mr. Celestine had disposed of a gun prior to Mr. Celestine's attempt to scale the second fence.

33. As Mr. Celestine attempted to hoist himself over the fence, with both of his hands visibly placed on the fence, Defendant Bissell approached him, drew his Taser, and tased him.  Defendant Bissell's body worn camera footage shows that Defendant Bissell was within close proximity to Mr. Celestine when he deployed his Taser—surely close enough to grab Mr. Celestine with his hands instead of assaulting him with the Taser, which is a dangerous weapon designed to cause excruciating pain.[3]  The footage shows that the Taser struck Mr. Celestine in his buttock and his right leg and that he fell several feet to the ground and collapsed.

34. Defendant Bissell's use of a Taser under these circumstances was a clear violation of the then nearly eight-year old federal Consent Decree between NOPD and the U.S. Department of Justice, long-standing NOPD policy issued under the Consent Decree, and Defendant Bissell's training under the Consent Decree.

35. The Consent Decree provides that "Officers shall use ECWs [Electronic Control Weapons] only when such force is necessary to protect the officer, the subject, or another party from physical harm, and other less intrusive means would be ineffective.  Officers shall be authorized to use ECWs to control a violent suspect when attempts to subdue the suspect by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the suspect within contact range."[4]

---

[3] *See* Sara Miller & James Benedict, *Shocked by a Taser: "Overwhelming." "Excruciating pain.",* REUTERS, Sept. 20, 2017, *available at* https://www.reuters.com/article/us-usa-taser-stunned-shocked-by-a-taser-overwhelming-excruciating-pain-idUSKCN1BV1EW; Erica Goode, *Tasers Pose Risks to Heart, a Study Warns*, NY TIMES, April 30, 2012, *available at* https://www.nytimes.com/2012/05/01/health/research/taser-shot-to-the-chest-can-kill-a-study-warns.html.

[4] *Amended and Restated Consent Decree Regarding the New Orleans Police Department*, 1, 20 ¶ 54 (Oct. 2, 2018), *available at* https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Consent-Decree.pdf/.

36. The Consent Decree further provides that "ECWs will not be used where such deployment may cause serious injury or death from situational hazards, ***including falling***, drowning, losing control of a moving vehicle, or igniting a potentially explosive or flammable material or substance, except where lethal force would be permitted."[5]  Mr. Celestine's position several feet off the ground on the fence virtually guaranteed a fall that would result in injury.

37. Consistent with the Consent Decree, NOPD policy provides that "[m]ere flight from an officer is not sufficient cause for the use of a CEW [Conducted Energy Weapon.]  The use of a CEW on a fleeing subject when a possible risk to the safety of the officer, the subject, or others has not been established by articulable justification other than flight, is unreasonable."[6]

38. In relevant part, NOPD policy further places the following restrictions on Taser use: "CEWs are authorized for use when: (a) A subject who may be lawfully detained or apprehended poses an imminent risk of harm to the officer(s), the subject, or others; (b) Attempts to subdue the subject with less intrusive means have been or will likely be ineffective; <u>AND</u> (c) There is an objectively reasonable expectation that it would be unsafe for officers to approach the suspect within contact range."[7]

39. NOPD policy further prohibits the use of a Taser in response to mere "[a]ctive resistance—[r]esistance exhibited by a suspect that is between passive resistance and aggressive resistance (e.g., attempts to leave the scene, flee, hide from detection, or pull away from the officer's grasp)."[8]

---

[5] *Id*. at ¶ 56 (emphasis added).

[6] New Orleans Police Dept. Operations Manual, *Conducted Energy Weapon (CEW)*, Chapter 1.7.1, 1, 1 (last revised Dec. 6, 2020), *available at* https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-7-1-Conducted-Energy-Weapon-EFFECTIVE-12-6-20.pdf/?lang=en-US. *See e.g.*, New Orleans Police Dept. Operations Manual, *Use of Force*, Chapter 1.3, 1, 9 (last revised April 1, 2018), *available at* https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/.

[7] New Orleans Police Dept. Operations Manual, *Conducted Energy Weapon (CEW)*, Chapter 1.7.1, 1, 1 (last revised Dec. 6, 2020) (emphasis in original), *available at* https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-7-1-Conducted-Energy-Weapon-EFFECTIVE-12-6-20.pdf/?lang=en-US.

[8] *Id.* at 2.

40. On information and belief, Defendant Bissell knew of and received training on the strict limitations on Taser use in both the Consent Decree and NOPD policy.

41. Defendant Bissell ignored the Consent Decree, NOPD policy, and his training when he tased Mr. Celestine and caused Mr. Celestine to fall several feet to the ground from the top of a fence.

### C.  The Unlawful Searches and Unlawful Indifference to Mr. Celestine's Serious Medical Needs

42. Defendant Bissell turned the fallen Mr. Celestine onto his stomach, such that Mr. Celestine's face was pressed to the ground.  Defendant Bissell then placed handcuffs on Mr. Celestine so that one of his wrists was painfully twisted.  Mr. Celestine's wrists remained in this painfully twisted position until another Officer, Derrick Llewellyn, fixed the handcuffs more than 20 minutes later.

43. After Defendant Bissell placed handcuffs on Mr. Celestine, Defendant O'Dell arrived on scene and searched Mr. Celestine, finding nothing on Mr. Celestine's person except for a phone and cash. Defendant Bissell subsequently communicated to fellow officers his belief that Mr. Celestine had tossed the suspected gun while running.

44. As Mr. Celestine lay on the ground, Defendant Bissell started to read Mr. Celestine his Miranda rights.  Midway through, Mr. Celestine gasped, "I can't breathe," several times.  Defendant Bissell told him to "shut up."

45. Defendant O'Dell then pulled Mr. Celestine off the ground as Mr. Celestine continued to assert that he could not breathe.  Defendant O'Dell yelled at Mr. Celestine to stand up as Mr. Celestine pleaded for the opportunity to catch his breath.

46. Defendant O'Dell demanded that Mr. Celestine stand up "like a man [because if] you run like a man, you act like a man."

47. Defendant O'Dell proceeded to walk Mr. Celestine back to the police van, while Defendant Bissell retraced his steps to look for the gun he said Mr. Celestine had discarded while running.  Defendant Bissell did not retrieve any item in his search of the area.

48. As shown in Defendant O'Dell's body worn camera footage, Mr. Celestine was unable to hold himself up and was doubled over for the entire walk back to the police van.  He can be heard groaning and gasping in pain.

49. As Defendant O'Dell was forcing Mr. Celestine to stand and walk, Officer Llewellyn arrived on the scene.  At this point, after only a few paces, Mr. Celestine fell to the ground.  Rather than express concern about a potential medical emergency, Defendant O'Dell exclaimed in frustration, "come on, bruh."  He then decided to take the opportunity to search Mr. Celestine again, who was then still on the ground.  Officer Llewellyn assisted.  This time, Defendant O'Dell found two small, wrapped bags of white powder in Mr. Celestine's front pants pocket and some additional bills and change.   Mr. Celestine continued to labor to breathe and groaned when Defendant O'Dell reached into his back pocket, close to where the Taser prong struck.  In response to the groan, Defendant O'Dell told Mr. Celestine that the Taser did not even hit him.

50. Defendant O'Dell and Officer Llewellyn next pulled Mr. Celestine up and walked him several feet, telling him repeatedly to "stand up." Mr. Celestine, however, could not hold himself up.  He fell a second time while groaning in pain.  Defendant O'Dell expressed irritation again, saying "Come on man! All that drama queen shit."

51. Defendant O'Dell pulled Mr. Celestine up again and walked him the rest of the way back to the police van.  Once they reached the van, instead of attending to Mr. Celestine's serious medical needs, Defendant O'Dell proceeded to search Mr. Celestine a third time.  He did not find any additional items.

52. Defendant O'Dell's vehicle was locked, so Mr. Celestine was escorted to Officer Llewellyn's car.  As Mr. Celestine limped to the vehicle, Defendant O'Dell conducted a fourth search of Mr. Celestine, patting him down and then reaching into Mr. Celestine's pant leg, where he retrieved a gun.

53. Mr. Celestine was placed in the backseat of Officer Llewellyn's car.

54. Once Mr. Celestine was in the police car, Defendant O'Dell told the other officers not to let Mr. Celestine take any of his jackets off, and to let him "sweat it out."  Without inquiring further into Mr. Celestine's condition, Defendant O'Dell left Mr. Celestine in Officer Llewellyn's car and drove his police van to find Defendant Bissell.

55. Under NOPD policy, "[i]mmediately following a use of force, officers and supervisors shall inspect and observe subjects for injury or complaints of pain.  Officers shall obtain medical assistance for any person who exhibits signs of physical distress, has sustained visible injury, [or] expresses a complaint of injury or continuing pain."[9]

56. Defendants Bissell and O'Dell did not adhere to NOPD policy.  Despite Mr. Celestine's obvious physical agony, his repeated pleas of "I can't breathe," and his inability to stand up on his own following Defendant Bissell's Taser deployment, neither Defendant O'Dell nor Defendant Bissell called for an ambulance.  In contrast to their callous disregard for Mr. Celestine's well-being, Officer Llewellyn, who stayed with Mr. Celestine, eventually called for an ambulance as Mr. Celestine continued to groan in pain; he could not hold his body up even while seated inside the police car.

57. While Mr. Celestine and Officer Llewellyn were waiting for Emergency Medical Services ("EMS") to arrive, Mr. Celestine called out for Officer Llewellyn's help with his handcuffs because his right wrist was twisted.  When Officer Llewellyn opened the car door to help Mr. Celestine, Mr. Celestine was lying sideways on the seat, with his head on the car door.  In this position, the only way Mr. Celestine could hold himself up was by using his hands, but Mr. Celestine's weight was falling on his twisted wrist, causing him a great deal of pain.  Officer Llewellyn fixed Mr. Celestine's handcuffs.

58. Several minutes after Officer Llewellyn called an ambulance, one arrived.  Paramedics took Mr. Celestine to Tulane Lakeside Medical Center.  Officer Llewellyn accompanied him.

---

[9] New Orleans Police Dept. Operations Manual, *Use of Force*, Chapter 1.3, 1, 6 (last revised April 8, 2018), *available at* https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/.

59. The emergency room physician diagnosed Mr. Celestine with dyspnea (labored breathing) and tachycardia (an abnormally fast heart rate).

60. The hospital kept Mr. Celestine on fluids and under observation for about three hours. Mr. Celestine was discharged at approximately 8:00 p.m., nearly four hours after Defendant Bissell had tased him.

61. After he was discharged, Mr. Celestine was immediately taken to the Orleans jail for booking. He was charged with five crimes: resisting an officer; possession of a firearm by a convicted felon; illegal carrying of a weapon with a controlled dangerous substance; illegal possession of a stolen firearm; and possession with intent to distribute cocaine less than 28 grams. His total bond was set at $21,500. He also had a parole hold placed on him, barring him from bonding out.

62. More than one year later, on January 28, 2021, the Orleans Parish District Attorney's Office dismissed all charges against Mr. Celestine.

63. Mr. Celestine was incarcerated for over a year because of the actions taken by Defendants Bissell, O'Dell and Grijalva. As a result, Mr. Celestine lost valuable time with his family and was forced to endure incarceration during the deadly COVID-19 pandemic, at a time when as much as 10% of the Orleans Jail's population became infected with the virus[10] — an infection rate astronomically greater than Louisiana's average at that time, when only 0.002% of the state population was infected with the virus.[11]

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Excessive Force in Violation of the Fourth Amendment under 42 U.S.C. § 1983**
**(Against Defendants Bissell and Doe Insurance Companies 1-10)**

64. All previous paragraphs are incorporated as if fully stated here.

---

[10] *See* Chart of Orleans Parish Sheriff's Office COVID-19 Inmate Cases, https://www.opso.us/index.php?option=com_content&view=category&layout=blog&id=144&Itemid=873&limitstart=22.

[11] *See* Active Cases in Louisiana, https://www.worldometers.info/coronavirus/usa/louisiana/.

65. Defendant Bissell employed excessive and unreasonable force against Mr. Celestine, as specifically alleged above, in violation of Mr. Celestine's rights under the Fourth Amendment.

66. Defendant Bissell used excessive and objectively unreasonable force when he tased Mr. Celestine in the buttock and right leg, causing Mr. Celestine to fall several feet to the ground. Mr. Celestine was merely fleeing and did not pose an imminent threat or risk of harm to Defendant Bissell or anyone else when he was tased.

67. Defendant Bissell's violation of Mr. Celestine's Fourth Amendment right to be free from the use of unreasonable force is evidenced by the fact that his use of a Taser on Mr. Celestine violated the plain terms of the Consent Decree and NOPD policy, on which he has been trained.

68. As a result of Defendant Bissell's excessive and objectively unreasonable use of force against Mr. Celestine, Mr. Celestine suffered Taser wounds penetrating his skin on his buttock and right leg.

69. As a result of Defendant Bissell's excessive and objectively unreasonable use of force against Mr. Celestine, Mr. Celestine fell several feet onto his back, which has caused him lasting back pain.

70. As a result of Defendant Bissell's excessive and objectively unreasonable use of force against Mr. Celestine, Mr. Celestine suffered tachycardia and dyspnea, requiring nearly three hours of hospitalization.

71. Defendant Bissell also used excessive and objectively unreasonable force when he pointed his department issued firearm at Mr. Celestine and threatened "I will fucking shoot you." At the time Defendant Bissell drew his firearm on Mr. Celestine and issued his threat to shoot, Mr. Celestine's actions did not create an objectively reasonable belief that the situation might escalate to the point at which lethal force would be authorized. Mr. Celestine did not pose a threat to Defendant Bissell as he ran—facing forward and without reaching into any pockets—and contrary to Defendant Bissell's assertions, nothing from the body camera footage revealed that Mr. Celestine ever reached into his pockets or drew a gun while running. Without fear of imminent bodily danger, Defendant Bissell's decision to pull his firearm on Mr. Celestine was not objectively reasonable given the facts.

72. At the time he used excessive and objectively unreasonable force against Mr. Celestine, Defendant Bissell was acting under color of Louisiana law, as he was acting in the course of his employment as a police officer with NOPD.

73. Defendant Bissell's use of excessive and objectively unreasonable force against Mr. Celestine, as described in this Count, was undertaken intentionally, with malice and knowing disregard for Mr. Celestine's clearly established constitutional rights.

74. Defendant Bissell's use of excessive and objectively unreasonable force against Mr. Celestine directly and proximately caused compensable injury to him.

75. Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable for actions taken within the scope of their employment activities. Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

**COUNT TWO**
**Unlawful Investigative Stop in Violation of the Fourth Amendment under 42 U.S.C. § 1983**
**(Against All Defendants)**

76. All previous paragraphs are incorporated as if fully stated here.

77. Defendants Bissell, O'Dell and Grijalva acted in concert to conduct an unlawful investigative stop of Mr. Celestine, as specifically alleged above, in violation of Mr. Celestine's rights under the Fourth Amendment.

78. Defendant Grijalva issued a directive that caused Defendants Bissell and O'Dell to stop Mr. Celestine.

79. Defendant Grijalva's directive to stop Mr. Celestine—nearly two hours *after* his supposed observation of a purported bulge in the pocket of Mr. Celestine's winter jacket, when Mr. Celestine reemerged on the street with completely *different* clothing—was not supported by reasonable articulable suspicion that Mr. Celestine was about to commit, was committing, or had committed a crime.

80. This is especially so given that Defendant Grijalva's observation from two hours earlier did not furnish reasonable articulable suspicion for a stop even then.  There is nothing suspicious about a person having his hand in the pocket of a winter jacket on a cold winter day, nor does body worn camera footage reveal a "bulge" consistent with the shape of a handgun in Mr. Celestine's pocket.  Thus, even two hours before Defendant Grijalva directed Defendants Bissell and O'Dell to stop Mr. Celestine, there were insufficient specific, objective, articulable facts to establish a well-founded suspicion that Mr. Celestine was about to commit, was committing, or had committed a crime.

81. Defendants Bissell and O'Dell committed an unlawful investigative stop when they approached Mr. Celestine with the express intent of stopping him, because at the time they approached Mr. Celestine, they were acting solely on information from Defendant Grijalva and thus did not have reasonable articulable suspicion that Mr. Celestine was about to commit, was committing, or had committed a crime.

82. At the time they acted in concert to conduct an unlawful investigative stop of Mr. Celestine, Defendants Bissell, O'Dell and Grijalva were acting under color of Louisiana law, as they were acting in the course of their employment as police officers with NOPD.

83. Defendants' unlawful investigative stop of Mr. Celestine directly and proximately caused compensable injury to him, including invasion of his privacy, deprivation of his right to be free from government intrusion, and his incarceration for more than a year.

84. Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable for actions taken within the scope of their employment activities.  Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

## COUNT THREE
### False Arrest in Violation of the Fourth Amendment under 42 U.S.C. § 1983
### (Against All Defendants)

85. All previous paragraphs are incorporated as if fully stated here.

86. Defendants Bissell, O'Dell and Grijalva effectuated a false arrest of Mr. Celestine when they arrested him without probable cause that he had committed a crime, as specifically alleged above, in violation of Mr. Celestine's Fourth Amendment rights.

87. At the time of arrest, Defendants Bissell and O'Dell detained Mr. Celestine on the charge of "resisting an officer."

88. Defendants Bissell and O'Dell did not have probable cause to arrest Mr. Celestine for "resisting an officer." An individual's flight from a police officer justifies a charge of "resisting an officer" under La. Stat. § 14:108 only when the officer has lawful grounds for detaining the individual and notifies the individual that he is being detained. Defendants Bissell and O'Dell did not have lawful grounds for detaining Mr. Celestine, as set forth in Count Two, nor did they notify Mr. Celestine that they were detaining him.

89. Defendant Grijalva acted in concert with Defendants Bissell and O'Dell in falsely arresting Mr. Celestine because his unfounded suspicions led to Mr. Celestine's arrest.

90. At the time they acted in concert to falsely arrest Mr. Celestine, Defendants Bissell, O'Dell and Grijalva were acting under color of Louisiana law, as they were acting in the course of their employment as police officers with NOPD.

91. Defendants' false arrest of Mr. Celestine directly and proximately caused compensable injury to him, including invasion of his privacy, deprivation of his right to be free from government intrusion, and his incarceration for more than a year.

92. Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable for actions taken within the scope of their employment activities.  Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

**COUNT FOUR**
**Illegal Search in Violation of the Fourth Amendment under 42 U.S.C. § 1983**
**(Against All Defendants)**

93. All previous paragraphs are incorporated as if fully stated here.

94. Defendants Bissell and O'Dell unlawfully searched Mr. Celestine, as specifically alleged above, in violation of Mr. Celestine's Fourth Amendment rights.

95. Defendants Bissell and O'Dell searched Mr. Celestine four times incident to his arrest.

96. These repeated searches were illegal because the arrest itself was illegal.

97. Defendant Grijalva acted in concert with Defendants Bissell and O'Dell in connection with these illegal searches because these illegal searches were the reasonably foreseeable result of Defendant Grijalva's directive to stop Mr. Celestine without reasonable articulable suspicion that Mr. Celestine was about to commit, was committing, or had committed a crime.

98. At the time they illegally searched Mr. Celestine, Defendants Bissell and O'Dell were acting under color of Louisiana law, as they were acting in the course of their employment as police officers with NOPD.

99. At the time Defendant Grijalva issued his directive to stop Mr. Celestine, he was acting under color of Louisiana law, as he was acting in the course of his employment as a police officer with NOPD.

100.   The repeated unlawful searches of Mr. Celestine directly and proximately caused compensable injury to him, including the violation of his bodily integrity, the invasion of his privacy, and his incarceration for more than a year.

101.   Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable

for actions taken within the scope of their employment activities.  Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

**COUNT FIVE**
**Deliberate Indifference to Serious Medical Needs in Violation of Fourteenth Amendment under 42 U.S.C. § 1983**
**(Against Defendants Bissell, O'Dell and Doe Insurance Companies 1-10)**

102.    All previous paragraphs are incorporated as if fully stated here.

103.    Officers Bissell and O'Dell exhibited deliberate indifference to Mr. Celestine's serious medical needs, as specifically alleged above, in violation of Mr. Celestine's Fourteenth Amendment rights.

104.    Defendants Bissell and O'Dell were aware or should have been aware that Mr. Celestine suffered injuries and thus had serious medical needs requiring immediate medical attention when, after Defendant Bissell tased Mr. Celestine and Mr. Celestine fell several feet to the ground on his back, Mr. Celestine complained that he could not breathe, had obvious difficulty breathing, complained of pain, had difficulty walking, and fell to the ground while being escorted.

105.    In fact, NOPD policy explicitly required Defendants Bissell and O'Dell to obtain medical care for Mr. Celestine.[12]

106.    Despite Mr. Celestine's obvious need for medical assistance, Defendants Bissell and O'Dell did not obtain it for him.

107.    Twenty minutes after Defendant O'Dell left Mr. Celestine in a police van, Officer Llewellyn, in contrast to Defendants Bissell and O'Dell, recognized Mr. Celestine's serious medical needs and called for an ambulance.

108.    When Mr. Celestine was taken to the hospital, hospital staff confirmed Mr. Celestine's serious medical needs, diagnosing him with a rapid heart rate and labored breathing—consistent with his complaints to Defendants Bissell and O'Dell—and waited until he stabilized to discharge him.

---

[12] *See supra* at ¶ 55.

109.    The failure of Defendants Bissell and O'Dell to obtain medical assistance for Mr. Celestine in response to his obvious pain and injury—pain and injury recognized and acted on by a fellow officer and confirmed by medical diagnosis—constituted deliberate indifference to Mr. Celestine's serious medical needs.

110.    At the time of their deliberate indifference to Mr. Celestine's serious medical needs, Defendants Bissell and O'Dell were acting under color of Louisiana law, as they were acting in the course of their employment as police officers with NOPD.

111.    Defendants' deliberate indifference to Mr. Celestine's serious medical needs directly and proximately caused compensable injury to Mr. Celestine.

112.    Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable for actions taken within the scope of their employment activities.  Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

**COUNT SIX**
**Common Law False Arrest**
**(Against All Defendants)**

113.    All previous paragraphs are incorporated as if fully stated here, including all paragraphs from Count Three, which alleges false arrest in violation of the Fourth Amendment against Defendants Bissell, O'Dell, Grijalva and Doe insurance companies 1-10.

114.    The arrest of Mr. Celestine by Defendants Bissell, O'Dell and Grijalva also violated Louisiana common law, which prohibits arrests without probable cause, and is actionable under Louisiana Civil Code Article 2315.

115.    The false arrest of Mr. Celestine by Defendants Bissell, O'Dell and Grijalva directly and proximately caused compensable injury to him, including invasion of his privacy, deprivation of his right to be free from government intrusion, and his incarceration for more than a year.

116.    Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable for actions taken within the scope of their employment activities.  Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

### COUNT SEVEN
### Common Law Assault
### (Against Defendant Bissell)

117.    All previous paragraphs are incorporated as if stated here.

118.    Defendant Bissell threatened to use excessive and objective unreasonable force against Mr. Celestine when he threatened to shoot him, threatened to tase him, and deployed his Taser on him.

119.    Defendant Bissell's threats to use excessive and objectively unreasonable force against Mr. Celestine constituted assault, and are actionable under Louisiana Civil Code Article 2315, because they were threats with the then-present ability to carry them out, which placed Mr. Celestine in reasonable apprehension of receiving injury.

120.    Defendant Bissell's assault on Mr. Celestine directly and proximately caused compensable injury to Plaintiff.

### COUNT EIGHT
### Common Law Battery
### (Against Defendant Bissell)

121.    All previous paragraphs are incorporated as if stated here.

122.    Defendant Bissell used excessive and objectively unreasonable force against Mr. Celestine when he Tased Mr. Celestine.

123.    Defendant Bissell's use of a Taser against Mr. Celestine constituted battery, and is actionable under Louisiana Civil Code Article 2315, because it was an unjustified, non-consensual, harmful touching intended to strike Mr. Celestine.

124.    Defendant Bissell's use of a Taser further constituted battery, actionable under Louisiana Civil Code Article 2315, because Mr. Celestine's arrest was unlawful and any use of force used to effectuate an unlawful arrest is battery.

125.    Defendant Bissell's battery on Mr. Celestine directly and proximately caused compensable injury to Plaintiff.

**COUNT NINE**
**Negligence**
**(Against Defendants Bissell, O'Dell and Doe Insurance Companies 1-10)**

126.    All previous paragraphs are incorporated as if stated here.

127.    Defendants Bissell and O'Dell owed a duty to protect Mr. Celestine from injury and to care for his safety and well-being when Mr. Celestine was in their custody.  This duty included the obligation to ensure that Mr. Celestine received medical assistance for his serious medical needs.

128.    Defendants Bissell and O'Dell breached their duty of care to Mr. Celestine while he was in their custody by their failure to obtain medical assistance in response to the obvious distress, pain and injury he was suffering after being tased by Defendant Bissell and falling to the ground.

129.    Defendants Bissell and O'Dell were aware or should have been aware of the distress, pain and injury Mr. Celestine was suffering when he was in their custody, as well as his corresponding need for medical care, because they knew that Mr. Celestine had been tased and had fallen several feet to the ground on his back, and because Mr. Celestine complained that (i) he could not breathe; (ii) had obvious difficulty breathing; (iii) consistently complained of pain; (iv) had difficulty walking; and (v) fell to the ground while being escorted.

130.    Confirming Mr. Celestine's need for medical assistance while in the custody and care of Defendants Bissell and O'Dell, hospital staff diagnosed Mr. Celestine with a rapid heart rate and labored breathing and waited until he stabilized before discharging him.

131.    Mr. Celestine suffered injury as a result of Defendant Bissell and Defendant O'Dell's breach of their duty of care to him.

132.    Doe insurance companies 1-10 are listed defendants because Louisiana indemnity law requires public entities to pay any tort judgment for compensatory damages for which employees are liable for actions taken within the scope of their employment activities.  Doe insurance companies 1-10 are jointly and severally liable for any and all damages arising from the injuries suffered by Mr. Celestine.

## RELIEF REQUESTED

WHEREFORE, Mr. Celestine respectfully requests that the Court grant the following relief:

a.   Entry of judgment against Defendants on all Counts;

b.   A declaration that Defendants' conduct violated the Fourth and Fourteenth Amendments to the United States Constitution;

c.   A declaration that Doe Insurance Companies 1-10 are jointly and severally liable for any and all damages suffered by Mr. Celestine;

d.   An award of compensatory damages in an amount to be proven at trial;

e.   An award of special damages in an amount to be proven at trial;

f.   An award of punitive damages against Defendant Bissell in an amount to be proven at trial;

g.   An award of costs and attorneys' fees under 42 U.S.C. § 1988;

h.   An assessment of interest on any award of damages; and

i.   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury.

Respectfully submitted,

/s/ Neda Saghafi
Neda Saghafi (pro hac vice)
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Nsaghafi@venable.com
Telephone: (410) 244-7665
Facsimile: (410) 244-7742

Nora Ahmed (pro hac vice)
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
Nahmed@laaclu.org
Telephone: (504) 522-0628
Facsimile: (504) 613-6511

Graham Bosworth
La. Bar No. 29538
700 Camp Street
New Orleans, LA 70130
bosworth@bosworthlegal.com
Telephone: (504) 507-0831

*For Plaintiff Michael Celestine*